UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

|                           |   |                          |
|---------------------------|---|--------------------------|
| SHIBANI KANUNGO, M.D.,    | ) |                          |
|                           | ) |                          |
|     Plaintiff,            | ) | Action No. 5:12-CV-112-JMH |
|                           | ) |                          |
| v.                        | ) |                          |
|                           | ) |                          |
|                           | ) | **MEMORANDUM OPINION AND ORDER** |
| UNIVERSITY OF KENTUCKY,   | ) |                          |
|                           | ) |                          |
|     Defendant.            | ) |                          |

** ** ** ** **

This matter is before the Court on the Motion for Summary Judgment [DE 28] filed by Defendant University of Kentucky (UK). The matter has been fully briefed [DE 31, 32] and is ripe for this Court's review.

Dr. Shibani Kanungo alleges retaliation and discrimination on the basis of her race and national origin in violation of Title VII of the Civil Rights Act of 1964 and the Kentucky Civil Rights Statute, KRS Chapter 344, and discrimination in violation of 42 U.S.C. § 1981 on the basis of national origin and race. As compensation for her loss, she seeks back pay, front pay, and fringe benefits as well as damages for mental anguish, pain, and suffering, embarrassment and humiliation, punitive damages and attorney fees.  While Kanungo alleges a tapestry of events, she fails to sufficiently allege a prima facie case with respect to her retaliation claim and cannot meet her burden to show that

the reasons offered for her termination were pretextual. Accordingly, the Court finds that there is no genuine dispute of material fact, and UK is awarded summary judgment as a matter of law on all claims.

## I. Factual Background

Dr. Kanungo was born and raised in Mumbai, India. She moved to Lexington, Kentucky in 2004 to complete her residency following her graduation from medical school in Moscow, Russia. Upon completion of her residency at UK in 2007, Dr. Kanungo was hired as an Academic Clinician Scientist by UK. In addition to her education and research responsibilities, her primary clinical responsibilities were in the Newborn Screening/Pediatric Metabolic Clinic (Clinic). Dr. Charlton Mabry founded the Clinic and continued to work there until 2011. Although Dr. Mabry oversaw the Clinic and its staff, Dr. Kanungo did not report to Dr. Mabry. She was directly supervised by Dr. Timothy Bricker, Chairperson for the Pediatric Department. The parties agree that Dr. Kanungo and Dr. Mabry did not get along well and that the clinic staff's relationship with Dr. Kanungo was also strained.

## A. Statements by Dr. Mabry

Dr. Kanungo's complaints revolve around statements made by Dr. Mabry during a meeting[1] in June 2009. During the meeting, Dr. Mabry allegedly told Dr. Kanungo, "this doctor from India is scheming the system. There were medical students from Iran who were scheming the system too. My wife was in the medical school's admission, and we got rid of such people. U.K. gets rid of people like [you]". [DE 31-16 at p. 16, ID# 642.][2]

## B. Dr. Bricker's Response

Within a week, Dr. Kanungo reported Dr. Mabry's statements to her supervisor, Dr. Bricker. [DE 31-16 at p. 16, ID# 643.] Dr. Kanungo testified that Dr. Bricker responded by pointing out that Dr. Mabry was a professor emeritus and that she was simply a junior faculty member. [DE 31-16 at 18, ID# 644.] She was

---

[1] Dr. Kanungo believed that the meeting was about grant funding, but Dr. Mabry stated that he had gathered Dr. Kanungo and the department administrator, Rebecca Napier, to discuss Dr. Kanungo's request for new furniture for her office. [DE 28-5 at 18, ID# 179; DE 31-16 at p. 16, ID# 642.]

[2] Throughout the briefing on this motion for summary judgment, UK fails to construe the evidence and all reasonable inferences in favor of Dr. Kanungo as required, but instead invites the Court to engage in fact-finding by putting forth UK's version of the facts as more credible than those recited by Dr. Kanungo. See [DE 32 at 6] (disputing whether Dr. Bricker made the statements as alleged by Dr. Kanungo). For instance, UK does not accept, for purposes of the motion, that Dr. Mabry said that UK "gets rid of" people like Dr. Kanungo, as alleged. [DE 28; DE 31] Throughout this Court's analysis, it has construed all factual evidence and all reasonable inferences in the light most favorable to Dr. Kanungo, as required. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

advised that she needed to be careful of her career. [DE 31-16 at 18, ID# 644.] Dr. Kanungo responded, "it's not about a junior assistant professor or a professor emeritus. It is about an inappropriate statement about my country of origin and my integrity, and I will not stand for it." [DE 31-16 at 18, ID# 644.] Dr. Kanungo did not file a report with the Office of Institutional Equity at UK. [DE 31-16 at 19, ID# 645.]

**C. Dr. Kanungo's suspension from the Clinic**

Several weeks later, in July 2009, Dr. Mabry dismissed or expelled Dr. Kanungo from her clinical duties because, Dr. Mabry believed, she had upset Carol Reid, a long-time employee at the Clinic. [DE 31-16 at 23, ID# 649.] According to Dr. Mabry, Dr. Kanungo continuously upset Ashley Daub, a nutritionist at the clinic, to the point that Ms. Daub resigned. [DE 28-5 at 17, ID# 178.] However, Dr. Mabry did not have the ability to fire, or modify Dr. Kanungo's job duties, so her hiatus from the Clinic was brief. When Dr. Kanungo's supervisor, Dr. Bricker, returned from his vacation two weeks later, Dr. Kanungo returned to her full job duties at the Clinic. [DE 31-16 at 23, 27, ID# 649, 653.] While Dr. Kanungo's job duties were restricted, she continued to perform other duties at the hospital and she continued to be paid. [DE 31-16 at 26, ID# 652.]

**D. Investigation**

Shortly thereafter, on August 27, 2009, Dr. Bricker, Rania Burke, the Pediatric Department Administrator, and John Sampson, a representative from Human Resources, developed a Performance Improvement Plan for Dr. Kanungo. [DE 28-8 at 9, ID# 223; DE 28-9, ID# 241—42.] The plan addressed mandatory weekly meetings, division meetings, and Dr. Kanungo's relationship with and behavior towards others, particularly staff at the Clinic. [DE 28-9.]

Patty Bender, the Assistant Vice President for Equal Opportunity, investigated Dr. Kanungo's complaints in September 2009. Bender first learned of Dr. Kanungo's discrimination complaints when John Sampson, the Human Resources representative in the College of Medicine, contacted her on September 1, 2009. [DE 28-18 at 9, ID# 371; DE 28-18 at 66, ID# 428.] Later, on September 29, 2009, Bender attended a weekly meeting of Clinic staff and then interviewed Dr. Kanungo about her allegations. [DE 28-18 at 14—15, ID# 376—77; DE 28-8 at 24—26, ID# 386—88.] Bender also interviewed Carol Reid and Dr. Mabry about the allegations [DE 28-18 at 31—32, ID# 393—94.] Dr. Mabry admitted that he made most of the statements as reported by Dr. Kanungo, but there was no mention of his statement that UK "gets rid" of people like her. [DE 28-18 at 31—32, ID# 393—94.] Ultimately, Bender concluded that Dr. Mabry was "trying his best to make her

successful" and that there were problems with the relationships at the Clinic, but that Dr. Mabry's statements and actions did not demonstrate a sufficiently severe or pervasive discriminatory atmosphere. [DE 28-18 at 38—39, ID# 400—01.] Dr. Kanungo was not informed of the results of the investigation until April 2010 when Dr. Jay Perman was responding to Dr. Kanungo's appeal of her 2009 evaluation, which is discussed below. [DE 31-17 at 29, ID# 722.] After learning that the investigation was concluded, Dr. Kanungo met with Bender to discuss the outcome of the investigation. [DE 31-17 at 31, ID# 724.] Bender informed her of the results and made statements to the effect that if Dr. Kanungo was unhappy she should go elsewhere but that her discrimination complaint was otherwise "water under the bridge." [DE 31-17 at 29, 31, ID# 722, 724.]

**E. Performance Reviews**

Following implementation of the Performance Improvement Plan and Bender's investigation into Dr. Kanungo's allegations, Dr. Kanungo's performance was analyzed in her Second Year Review. This Second Year Review was a standard evaluation in which the University assesses a faculty's progress toward promotion and tenure. It differed from the annual reviews that Dr. Kanungo had experienced in the past. [DE 28-2 at 35, ID# 143.] Dr. Kanungo was required to submit documentation, such as a revised curriculum vita, and other quantitative support for

her activities during the two years she had been appointed as faculty. [DE 28-2 at 34—35, ID# 142—43.] While Dr. Kanungo submitted the documentation as best she could, she felt that she had not been clearly told what type of materials and records that she should have been keeping over the two-year period to provide for the review. [DE 28-2 at 34—36, ID# 142—44.]

As part of this review, tenured faculty in the Pediatric Department, Dr. Henrietta Bada and Dr. Jackson Smith, were asked to evaluate Dr. Kanungo's progress and provide written results summarizing their findings. [DE 28-10, ID# 243; DE 28-11, ID# 247.] Their findings were then submitted to the Department of Pediatrics Tenure Review Committee. [*See* DE 28-10, ID# 243; DE 28-11, ID# 247.] Drs. Bada and Smith found that, in order to progress on her current track, Dr. Kanungo needed to demonstrate more focus in teaching, research, and publications, and, particularly, more specialization in metabolic disorders in all of those areas. [DE 28-10, ID# 243; DE 28-11, ID# 247.] Dr. Bada also pointed out that Dr. Kanungo's portfolio would be strengthened by additional documentation of her clinical services. [DE 28-10, ID# 243; DE 28-11, ID# 247.] Specifically, Dr. Bada stated that Dr. Kanungo would need to improve "involvement and interaction with other faculty members requesting consultations," show additional "effort on Pediatric resident teaching," publish in peer-reviewed publications, and

show that she has a reputation as being an authority in her field to meet the criteria for tenure. [DE 28-10, ID# 243—45.] In summary, Dr. Bada pointed out that Dr. Kanungo lacked "focus of interests or activities. She needs to devote more effort to the clinical services and teaching in the Department of Pediatrics . . . she needs to show more involvement in the department that awarded her the academic title." [DE 28-10, ID# 245.]

The Second Year Review was completed on October 5, 2009. [DE 28-12, ID# 250.] Dr. Bricker authored the review, which discussed the findings of Drs. Bada and Smith, as well as the discussion and feedback of other tenured faculty on the review committee. [DE 28-13, ID# 252.] The Second Year Review summarized the concerns of faculty and also provided specific suggestions for improvement and areas of research and publication focused on her field of specialization. [DE 28-12, ID# 250.] Dr. Kanungo, displeased with the review, appealed the Review to the Dean of the College of Medicine, Dr. Jay Perman, on March 22, 2010. [DE 28-13, ID# 252.] Dr. Perman's denial of the appeal, dated April 28, 2010, concluded that her "review was based on evaluations of [her] dossier and progress toward promotion and tenure, without influence based on [her] prior concerns about possible discrimination. . . ." [DE 28-13, ID# 252.]

In addition to the Second Year Review, Dr. Kanungo also had an annual review for 2009, which was completed in February 2010. [DE 28-4, ID# 159.] Dr. Kanungo's 2007 and 2008 annual reviews had been highly positive with scores of 5 [DE 31-2, ID# 587; DE 31 at 5, ID# 552], however, the 2009 annual review was not as positive. [DE 28-4, ID# 159.] In 2009, Dr. Kanungo received a score of 3, which indicated good, average or satisfactory performance. [DE 28-4, ID# 159.]

The annual review and Second Year Review covered the time period in which Dr. Kanungo's research study was terminated. She was awarded a grant in 2008 from UK's Children's Miracle Network to conduct research on MRSA[3], specifically focusing on clinical practices to eradicate MRSA by working with the whole family of the infected patient, rather than simply the infected patient. [DE 31-17 at 4, ID# 697.] However, funding for the grant was not renewed for the study's second year, which was 2009. [DE 28-15 at 6, ID# 342.] Drs. Jeffrey Moscow and Eric Smart, who oversaw the clinical research office responsible for the grants, determined that the study was not feasible given that Dr. Kanungo had not been able to recruit enough families to participate in the first year of the study. [DE 28-15 at 5—6, ID# 341—42.] Although Dr. Kanungo disagreed with the decision

_____

[3] Methicillin-resistant Staphylococcus aureus (MRSA), Centers for Disease Control, http://www.cdc.gov/mrsa/ (last visited Feb. 6, 2014).

to terminate the study, Dr. Kanungo does not argue that the termination of the study was related to, or retaliation for, her complaints about Dr. Mabry's behavior. [DE 31-17 at 13—14, ID# 706—07.] In fact, while the formal memo closing the study was sent in October 2009, Dr. Kanungo was first told to shut down the study in March 2009, before Dr. Mabry made the alleged discriminatory statements. [DE 28-17, ID# 361—62; DE 28-16, ID# 360.]

Following the 2009 review and Second Year Review, Dr. Kanungo tried to improve by obtaining additional clinical hours, participating in an emergency room training program, and writing an editorial for a publication in her field. [DE 31-17 at 24—25, 27, ID# 717—18, 720.] Nonetheless, her relationship with Dr. Mabry continued to deteriorate and other deficiencies noted in the Second Year Review and 2009 review continued. [DE 31-17 at 27, ID# 720.]

## F. Dr. Bricker's recommendation for a terminal contract

In June 2010, one year after Dr. Mabry's initial statements, Dr. Bricker advised Dr. Kanungo, via letter, that he was considering giving her a terminal contract. [DE 28-20, ID# 510.] He asked for additional information from Dr. Kanungo, including her updated curriculum vitae and materials relating to her research, teaching and service. [Id.]

On September 14, 2010, Dr. Bricker sent a memorandum to tenured faculty in the Department of Pediatrics requesting written judgments, pursuant to administrative regulations, on whether to grant Dr. Kanungo a terminal reappointment, ending on September 30, 2011. [DE 28-22, ID# 512.] Ten tenured members of the Department provided their written concurrences with the terminal reappointment decision. [DE 28-22, ID# 512—21.] Subsequently, the Promotion and Tenure Committee considered the recommendation of a terminal contract for Dr. Kanungo. [DE 28-23, ID# 522.] That Committee reviewed Dr. Kanungo's dossier, performance reviews, and written letters from the tenured faculty and, ultimately, unanimously agreed with the recommendation to grant a terminal contract to Dr. Kanungo. [DE 28-23, ID# 522.] By letter, dated September 30, 2010, Dean Wilson informed Dr. Kanungo that, based upon the recommendation of Dr. Bricker, "concurrence of the tenured faculty of the Department of Pediatrics[,] and the advice of the College of Medicine Appointment, Promotion and Tenure Committee," she had been "granted a terminal reappointment to the faculty of UK's College of Medicine, Department of Pediatrics" which would expire on September 30, 2011. [DE 28-24, ID# 523.]

### G. Change in Dr. Kanungo's Visa Status

Dr. Kanungo did not remain at UK until September 30, 2011, however, because her visa status in the United States changed.

11

In 2008, UK hired Sheila Minihane and Charles Baesler, attorneys with the law firm of Stoll, Keenan and Ogden, to assist with Dr. Kanungo's application for permanent immigration status. [DE 31-18 at 18, ID# 796.] In the spring of 2010, Baesler advised Dr. Kanungo that Dr. Bricker was not responding to requests for documentation to support an extension of her visa, which was set to expire on September 30, 2010, causing Dr. Kanungo to become concerned. [DE 31-17 at 32, ID# 725.] She hired another attorney in Colorado, Christopher Thomas, to assist her with her visa status, without advising UK, Minihane, or Baesler. [DE 31-17 at 42, ID# 735.] Attorney Thomas filed the paperwork to change Kanungo's visa from an H1B visa, which allowed her to stay in the country as long as she was employed, to an H4 visa, which would permit her to stay in the United States as a dependent on her husband's visa, but would not permit her to work. [DE 31-17 at 44, ID# 737.] The University did not learn that Dr. Kanungo changed her visa status until after Dean Wilson's letter awarding the terminal contract was sent on September 30, 2011. [DE 28-25, ID# 524.] In the meantime, UK had been working with attorneys Minihane and Baesler to file the necessary paperwork for a one year extension of Kanungo's H1B status so that she would be eligible for employment until September 30, 2011. [DE 28-26, ID# 525.] UK prepared the paperwork, as necessary, and it was submitted on September 30,

2010, which was the deadline. [DE 28-26, ID# 525.] Thus, there was a "delay" in her paperwork, in that it was not submitted earlier, but it was ultimately submitted by the deadline. However, once UK learned that Kanungo's status had become H4, Minihane withdrew the application for an H1B extension. [DE 28-25 at 524, ID# 524.]

On October 4, 2010, Dr. Bricker sent Kanungo a letter stating that in light of the change in her visa status, UK could no longer legally employ her. [DE 28-25, ID# 524.] Kanungo acknowledged that the change in her visa status legally prohibited her from working in the United States. [DE 28-19, ID# 474—75.] Because the change in visa status became effective on September 22, 2010, Dr. Kanungo's last day was considered to be September 21, 2010. [DE 28-25, ID# 524.]

## II. STANDARD OF REVIEW

Under Rule 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the factual evidence and all reasonable inferences must be construed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Summers v. Leis,* 368 F.3d 881, 885 (6th Cir. 2004).

This Court's function on a summary judgment motion is not to weigh the evidence, but to decide whether there are genuine issues of material fact for trial. *Anderson,* 477 U.S. at 249; *Multimedia 2000, Inc. v. Attard*, 374 F.3d 377, 380 (6th Cir. 2004). A material fact is one that may affect the outcome of the issue at trial, as determined by substantive law. *Anderson*, 477 U.S. at 242. A genuine dispute exists on a material fact and, thus, summary judgment is improper if the evidence shows "that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *Summers*, 368 F.3d at 885.

## III. Analysis

### A. Retaliation Claim

Plaintiff argues that UK took several adverse employment actions against her, but, upon close examination of her averments and the applicable law, she is unable to demonstrate a prima facie case of retaliation because she has identified no adverse actions as a matter of law.

To establish a prima facie case of unlawful retaliation under Title VII, Dr. Kanungo must show that: "1) [s]he engaged in activity that Title VII protects; 2) defendant knew that [s]he engaged in this protected activity; 3) the defendant subsequently took an adverse employment action against the plaintiff; and 4) a causal connection between the protected activity and the adverse employment action exists." *Abbott v.*

*Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003) (citations omitted); *see McClain v. NorthWest Cmty. Corr. Ctr. Judicial Corr. Bd.*, 440 F.3d 320, 335 (6th Cir. 2006). Dr. Kanungo asserts that she engaged in a protected activity by reporting Dr. Mabry's statements to Dr. Bricker in June 2009, that the protected activity was known to UK, and that UK retaliated against her for making the report by withholding UK's request for her H1B Visa extension in September 2011. *Id.* She also argues that Dr. Mabry's suspension or "dismissal" of her in July 2009 was an adverse employment action that further supports her prima facie case. The Court does not read Dr. Kanungo's response to argue that UK's decision to award her a termination contract constitutes an adverse employment action in the context of her retaliation claim. Plaintiff argues that she was forced to change her visa status by UK's delay and, as a result, it was not voluntary. [DE 31 at ID# 571—72.] However, none of her arguments address the decision to award Dr. Kanungo a terminal contract.[4] Additionally, Dr. Kanungo's complaint indicates that

---

[4] Even if made, this argument would falter at the causation stage. Even if Dr. Bricker's statements that she should be careful of her career could be construed as direct evidence of a retaliatory animus, which this Court does not do, Dr. Bricker did not make the decision to give her a terminal contract. He made a recommendation, which was reviewed and unanimously agreed upon by members of the Department of Pediatrics and the Promotion and Tenure Committee and received final approval from Dean Wilson.

her negative performance reviews were adverse employment actions. However, she has not developed this argument in response to the motion for summary judgment and there is no evidence that the pediatric faculty or the members of the Promotion and Tenure Committee were aware of Dr. Kanungo's complaints of Dr. Mabry's behavior.

Although disputed by UK, the Court agrees that Dr. Kanungo engaged in a protected activity when she reported Dr. Mabry's statements to her supervisor. "[A]n employee need not file a formal EEOC complaint to engage in protected activity-rather 'it is the assertion of statutory rights' that triggers protection under the ADEA's anti-retaliation provision." *Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007)(quoting *EEOC v. Romeo Cmty. Schs.*, 976 F.2d 985, 989 (6th Cir. 1992) (citing *Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 387 (10th Cir. 1984)). Likewise, construing the facts in Plaintiff's favor, UK knew that she had engaged in protected activity through her report of Dr. Mabry's statements to Dr. Bricker.

The issue of whether Dr. Kanungo was subjected to adverse employment actions, however, is where her case falters. The Court turns first to Dr. Kanungo's allegation that UK retaliated against her by withholding her visa paperwork, which, allegedly,

resulted in Dr. Kanungo's termination.[5]  The extension request, if approved, would have allowed Plaintiff to continue to work at UK for the next year, until September 2011, under her terminal contract.  It appears that, regardless of whether Dr. Kanungo released her claims against UK or not, she was subject to termination.  The question was whether that termination occurred in 2011 under a terminal contract, or whether that termination became effective on September 30, 2010, because her H1B visa status would expire and, thus, she would become ineligible for continued employment by UK.  Dr. Kanungo, however, has not pointed to any authority of any type that would require UK to continue to sponsor her H1B visa or to submit the paperwork in advance of the September 30th deadline.  It is uncontroverted

---

[5]    As evidence of UK's retaliatory animus, Dr. Kanungo argues that UK threatened to withhold the visa paperwork "unless Dr. Kanungo dropped her claims now presented before this court." [DE 31 at 24.] Assuming that this evidence relating to settlement negotiations is admissible under Fed. R. Evid. 408, as Plaintiff argues, it is unpersuasive.  The language submitted by Dr. Kanungo was taken from a proposed settlement agreement in which release of any and all claims were contemplated.  Several options that would have allowed for Dr. Kanungo's visa extension to be sponsored by UK until 2011 were explored by the parties as part of the settlement negotiations. Importantly, UK did not threaten to fire Dr. Kanungo or refuse to submit her paperwork unless she released her claims. Instead, there were multiple options available during the course of the settlement process, several of which provided for UK to process the paperwork for Dr. Kanungo's visa extension without requiring the release of her claims.  Moreover, as discussed herein, Dr. Kanungo has not demonstrated that the delay in processing, if it can be called that, was an adverse action.

that UK did, in fact, present the paperwork for an extension of Dr. Kanungo's visa within the designated timeframe.

Dr. Kanungo's argument is that the delay in the process caused her termination by changing her visa status, but this is a red herring. Dr. Kanungo changed her visa status before UK's deadline to submit her paperwork for the extension. Even if UK had not timely submitted her paperwork, Dr. Kanungo would have failed to demonstrate an adverse employment action. Dr. Kanungo has not shown that UK had any affirmative duty to continue to sponsor her visa. The delay of visa application processing, or even the decision to not sponsor an H1B visa, does not constitute an adverse employment action. *Collins-Pearcy v. Mediterranean Shipping Co.*, 698 F. Supp. 2d 730, 760 (S.D. Tex. 2010) (holding that refusal to sponsor employee's visa application, even where it will result in termination of employment, does not constitute an adverse employment action). As in *Collins-Pearcy*, Plaintiff has not established that the delay in submitting the paperwork "made it impossible" for her to continue employment. *Id*.

The brief suspension of Dr. Kanungo's clinical duties is, likewise, not sufficient to qualify as a material adverse action. The suspension is a material adverse employment action, Dr. Kanungo argues, because such an action might "dissuade[] a reasonable worker from making or supporting a charge of

discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). The "suspension" lasted no more than two weeks, and only applied to a portion of Dr. Kanungo's responsibilities and duties at the hospital. There is no evidence that the suspension negatively impacted her ability to perform her other tasks and the suspension only lasted as long as it did because her supervisor was unavailable to address the situation. Her pay was not suspended or reduced by Dr. Mabry's actions. There is no evidence that the suspension itself affected her subsequent performance reviews. Furthermore, it is undisputed that Dr. Mabry did not have the authority to suspend or fire Dr. Kanungo from the clinic.

Dr. Kanungo has not demonstrated how the temporary suspension from a portion of her duties materially changed the terms and conditions of her employment, particularly when the individual responsible had no authority to change the terms of her employment. *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 594 (6th Cir. 2007) ("A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . ."). Dr. Kanungo must show that the temporary suspension was "more

disruptive than a mere inconvenience or an alteration of job duties." *Id.* While perhaps inconvenient, her temporary suspension from the clinic falls short of a separate material adverse action.[6] *Id.*

Accordingly, UK is entitled to summary judgment on Dr. Kanungo's claims of retaliation.

**B. Discrimination**

For Dr. Kanungo to demonstrate a prima facie case of discrimination, she must show that she is a member of a protected class, that she was subjected to an adverse employment action, that she was qualified for the position, and that she was replaced by someone outside the protected group or treated differently than a similarly-situated, non-protected employee. *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 461 (6th Cir. 2001) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). A plaintiff may establish a prima facie case of discrimination either by presenting direct evidence of intentional discrimination by the defendant, or by providing circumstantial evidence which creates an inference of

---

[6] Additionally, the Court notes that there is no indication that Dr. Mabry knew that Dr. Kanungo had reported his statements to Dr. Bricker at the time that he "suspended" Dr. Kanungo from the Clinic. Thus, there is no evidence that he knew that she had engaged in a protected activity, and, as a result, she cannot meet that prong of her prima facie case.

discrimination. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004) (citing *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997)). Plaintiff does not allege, and indeed, the facts do not support, that Dr. Bricker, the other pediatric department faculty members, or the members of the Promotion and Tenure committee were motivated by any type of racial animus. Only Dr. Mabry's statements allegedly demonstrate racial animus, but Dr. Mabry was not involved in the decision to award Plaintiff a termination contract. Because Dr. Mabry did not act as a supervisor to, or participate in the determination to terminate, Dr. Kanungo, the direct evidence analysis does not apply. *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000); *see also Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 550 (6th Cir. 2004) (quoting *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998)) ("Statements by non-decision makers, or statements by decision makers unrelated to the decision process itself can not [sic] suffice to satisfy the plaintiff's burden of demonstrating animus.").

The parties agree that Dr. Kanungo is a member of a protected class and that she was qualified for the position she held at UK. Defendant contends, and this Court agrees for the reasons set forth previously, that Dr. Kanungo's suspension by Dr. Mabry from her clinical duties in July 2009 does not qualify as an adverse employment action.

Thus, the only adverse action of which Dr. Kanungo may complain is her termination. Based upon her arguments, her termination consisted of two components. First, UK decided to award her a terminal contract. Second, UK waited until the last minute to submit the paperwork for the extension of Dr. Kanungo's H1B visa status. Dr. Kanungo blends these two actions throughout her discussion, but they are separate.

The delay in the submission of Dr. Kanungo's visa paperwork did not cause Dr. Kanungo to be ineligible to work at UK. Despite her arguments that she was forced to apply for a change in her status, it was Dr. Kanungo's decision to change her visa status, and it was the subsequent change of status that resulted in her ineligibility for employment. The fact remains that UK submitted the paperwork for her visa extension within the required time frame. If she had not changed her visa status, there is no evidence that she would have become ineligible for employment. Thus, the alleged delay itself is not an adverse action. Accordingly, UK's decision to grant Dr. Kanungo a terminal contract is the only adverse action for purposes of this analysis.

With respect to the last requirement for a prima facie case, that she was replaced by someone outside the protected group or treated differently than a similarly-situated non-protected employee, Dr. Kanungo has alleged that she was

replaced by a Caucasian employee, Dr. Carolyn Bay.  Dr. Kanungo has not cited to any other evidence indicating that she was treated differently than other similarly-situated employees.

Dr. Bay, Dr. Kanungo argues, is a lesser qualified, Caucasian employee. Defendant argues, first, that Dr. Bay did not replace Dr. Kanungo. According to Defendant, no replacement was hired in that position.  Second, Defendant argues that, if Dr. Bay could be considered as Dr. Kanungo's replacement, Dr. Bay was more qualified for the position. The parties have simply not submitted much evidence on this issue, and the Court is unpersuaded that it could decide this issue on the record before it.  However, even assuming that Dr. Bay replaced Dr. Kanungo, Dr. Kanungo cannot demonstrate that the decision to award her a terminal contract was pretextual. Thus, the determination of whether Dr. Bay replaced Dr. Kanungo or is more qualified for the position does not impact the Court's analysis, and, thus, the Court need not reach it.  Accordingly, UK is entitled to summary judgment.

In the absence of direct evidence of discrimination, a burden-shifting analysis applies,[7] under which: 1) the plaintiff must first set forth a prima facie case of discrimination; 2) the burden of production then shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions; and 3) if the employer carries this burden, the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer were not its true reasons, but were pretext for discrimination. *DiCarlo*, 358 F.3d at 414—15. Throughout this analysis, the ultimate burden of persuasion lies with the plaintiff. *Id.*

UK has put forth evidence supporting its decision to award Dr. Kanungo a termination contract, including several evaluations of her performance and progress toward tenure, which were conducted by her peers. The termination decision itself was recommended by her supervisor, Dr. Bricker, but was based on unanimous agreement by two committees.

To show that UK's explanation is pretext, Dr. Kanungo may show "either (1) that the proffered reasons had no basis in

---

[7] Discrimination claims under § 1981 and the Kentucky civil rights statute, KRS 344.040, are analyzed under the same evidentiary framework as Title VII claims. *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 868 (6th Cir. 2001), *supplemented on denial of reh'g*, 266 F.3d 407 (6th Cir. 2001); *Talley v. Bravo Pitino Rest.*, 61 F.3d 1241, 1250 (6th Cir. 1995).

fact, (2) that the proffered reasons did not actually motivate h[er] discharge, or (3) that they were insufficient to motivate discharge." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). Plaintiff does not dwell on UK's proffered reasons for her termination at length but focuses, instead, on imputing Dr. Mabry's racial animus to UK through the cat's paw theory of liability.[8] *Staub v. Proctor Hosp.*, __U.S.__, 131 S.Ct. 1186, 1194 (2011).

The cat's paw "theory involves circumstances where a seemingly unbiased decisionmaker makes an adverse employment decision that was in part motivated by a biased subordinate." *Davis v. Omni-Care, Inc.*, 482 F. App'x 102, 109 (6th Cir. 2012) (citing *Cobbins v. Tenn. Dep't of Transp.*, 566 F.3d 582, 586 n.5 (6th Cir. 2009)). "[W]hen a plaintiff challenges his termination as motivated by a supervisor's discriminatory animus, he must offer evidence of a 'causal nexus' between the ultimate decisionmaker's decision to terminate the plaintiff and the supervisor's discriminatory animus." *Madden v. Chattanooga City*

---

[8] The Sixth Circuit has addressed the cat's paw theory in both direct and circumstantial evidence contexts. *Johnson v. Metro. Gov't of Nashville & Davidson Cnty. of Tenn.*, 502 F. App'x 523, 535 n.4 (6th Cir. 2012) ("The 'rubber-stamp' or 'cat's paw' theory of liability . . . is more appropriately dealt with in circumstantial evidence review."); *Romans v. Mich. Dept. of Human Servs.*, 668 F.3d 826, 836—37 (6th Cir. 2012) (Finding that plaintiff could not show direct evidence through the cat's paw theory). Dr. Kanungo has set forth a circumstantial evidence analysis, so the Court has used that structure here.

*Wide Serv. Dept.*, 549 F.3d 666, 677 (6th Cir. 2008).  Plaintiff must show that "[b]y relying on this discriminatory information flow, the ultimate decisionmakers acted as the conduit of [the supervisor's] prejudice—his cat's paw." *Id*. at 678 (internal quotation marks omitted).  Addressing the cat's paw theory in the context of a case brought under the United Services Employment and Reemployment Act (USERRA), the United States Supreme Court recently held that "if a [non-decsionmaking] supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse employment action, and if that act is proximate cause of the ultimate employment action, then the employer is liable." *Staub*, 131 S.Ct. at 1194; *see Davis* 482 F. App'x at 109.

Plaintiff's cat paw argument is unpersuasive.  There is no evidence that any action that Dr. Mabry took formed the basis for Dr. Kanungo's termination.  Dr. Kanungo's performance reviews and reviews of her progress toward tenure alleged various deficiencies in performance, including her research, publication and educational performances.  Her clinical performance was also criticized, but those complaints are unrelated to Dr. Mabry, or the difficulties that Dr. Kanungo had in her relationship with Dr. Mabry and his staff.

Dr. Kanungo does not point to any action that Dr. Mabry took that formed the basis for UK's adverse action.  Unlike other

situations in which the cat's paw theory has been applied, Dr. Mabry did not take any action or discipline Dr. Kanungo in a manner that was later relied upon as grounds for her termination. *See Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339 (6th Cir. 2012) (applying the cat's paw theory where the Human Resources Director, who was shown to have racial bias, misinformed various members of upper management resulting in denial of a promotion); *Staub*, 131 S. Ct. 1186 (two supervisors who were hostile to plaintiff's military service allegedly fabricated plaintiff's misconduct which resulted in progressive disciplinary actions and, ultimately, plaintiff's termination). Dr. Kanungo has not demonstrated a causal nexus between Dr. Mabry's alleged discriminatory animus and her termination. Thus, the cat's paw theory does not apply.

Dr. Kanungo, who bears the burden of demonstrating UK's intent to discriminate, has not come forward with any evidence that UK's proffered reasons for her termination had no basis in fact, did not actually motivate her discharge, or were insufficient to motivate her termination. *Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 558 (6th Cir. 2009) (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706—07 (6th Cir. 2006)). Dr. Kanungo does not argue that UK's proffered reasons were false or insufficient to motivate her termination, but challenges whether those reasons actually motivated her

discharge.  However, Dr. Kanungo has not cited any evidence on which a reasonable fact finder could rely to determine that UK's proffered reasons did not actually motivate the relevant decisionmakers when they granted her terminal contract. Dr. Kanungo does not cite to any direct or circumstantial evidence of discrimination outside of Dr. Mabry's statements.  Evidence that Dr. Kanungo may have been replaced by someone outside of the protected class, without more, is insufficient to demonstrate pretext. *Cicero v. Borg-Warner Automotive, Inc.*, 280 F.3d 579, 589 (6th Cir. 2002) ("[Plaintiff] may not rely exclusively on his prima facie evidence, but instead must introduce some further evidence of discrimination.").  Summary judgment is proper where plaintiff has failed to create a material issue of fact as to whether the proffered reasons were pretext for discrimination.  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 148 (2000) (holding that employer is entitled to judgment as a matter of law where "plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.")

Accordingly, UK is entitled to summary judgment on Dr. Kanungo's discrimination claims.

## IV. Conclusion

Accordingly, for the reasons set forth herein, **IT IS ORDERED** that Defendant's Motion for Summary Judgment [DE 28] is **GRANTED.**

This the 18th day of February, 2014.

Signed By:

*Joseph M. Hood*

Senior U.S. District Judge